# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CONCENTRIX CVG CUSTOMER      :      Case No. 1:21-cv-131
MANAGEMENT GROUP INC.,      :
     :      Judge Timothy S. Black
     Plaintiff,      :
     :
vs.      :
     :
STEPHAN J. DAOUST,      :
     :
     Defendant.      :

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (Doc. 7)

This civil case is before the Court on Plaintiff Concentrix CVG Customer

Management Group, Inc.'s motion for preliminary injunction (Doc. 7),[1] and the parties'

responsive memoranda (Docs. 22, 24).[2]  Also before the Court is Defendant Stephan J.

Daoust's objection to and motion to strike all evidence attached to Plaintiff's reply in

support of its motion for preliminary injunction.  (Doc. 26).[3]

---

[1] This motion (Doc. 7) was originally titled "motion for temporary restraining order and preliminary injunction."  However, after the Court entered its order regarding personal jurisdiction (Doc. 18), Concentrix changed its request to simply one for a preliminary injunction. (Doc. 21).

[2] The Court finds that an evidentiary hearing is unnecessary.  "[Sixth Circuit] Rule 65 jurisprudence indicates that a hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007).  Here, the issues presented, particularly the reasonableness of the non-compete agreement under Ohio law, and whether certain information is trade secret, are primarily questions of law, not fact.

[3] Finding that this motion to strike primarily argued local and evidentiary rules, the Court considered the motion to strike without any response or reply, and denied the motion. (4/22/2021 Notation Order).  The Court expands on its reasoning in this Order.

# I. BACKGROUND

The Court has already stated certain factual and procedural background in this case when deciding now-dismissed defendants TaskUs Holdings, Inc. and TaskUs, Inc.'s motion to dismiss for lack of personal jurisdiction. *See Concentrix CVG Corp. v. Daoust*, No. 1:21-CV-131, 2021 WL 1118025 (S.D. Ohio Mar. 24, 2021). The Court reincorporates that factual and procedural history here. Accordingly, in this Order, the Court will briefly summarize Concentrix's allegations, and then will relate the parties' evidence presented in support of and in opposition to Concentrix's motion for preliminary injunction. (Doc. 7).

Defendant Stephan J. Daoust is a former employee of Plaintiff Concentrix, formerly known as Convergys. (Doc. 14 at ¶ 23). During his 22-year tenure with Convergys/Concentrix, Daoust rose to the level of Senior Vice President – Operations. (*Id.*) On August 20, 2018, Daoust executed a Non-Disclosure and Non-Competition Agreement (the "NCA"). (*Id.* at ¶ 24; *see also* Doc. 14-1). In October 2018, Convergys was acquired by Concentrix. (Doc. 14 at ¶ 2).

On December 18, 2020, Daoust gave notice to Concentrix that he was terminating his employment effective December 31, 2020. (*Id.* at ¶ 38). Concentrix then learned that Daoust had accepted employment with TaskUs. (Doc. 15-1 at ¶ 6). On December 23, 2020, after learning of Daoust's employment with TaskUs, Concentrix sent correspondence to TaskUs and Daoust, notifying them of the NCA and Daoust's purported breach. (Doc. 15-1 at ¶ 6). Daoust officially ended his employment with Concentrix on December 31, 2020. (Doc. 14 at ¶ 38).

Concentrix alleges that TaskUs and Concentrix are direct competitors. (Doc. 14 at ¶ 39). Concentrix alleges that Daoust: (1) breached the NCA by going to work for one of Concentrix's direct competitors and by using and/or disclosing Concentrix's confidential, proprietary, and trade-secret information when performing services for TaskUs; and (2) misappropriated Concentrix's trade secrets by taking the position with TaskUs. (*Id.*)

Concentrix requests that that Court:

1. Restrain Daoust from continued employment at TaskUs as Chief Operating Officer and from committing any other violations of the NCA;

2. Restrain Daoust from using or disclosing any of Concentrix's confidential or proprietary information;

3. Require Daoust to immediately return to Concentrix any documents or information containing or comprising of Concentrix trade secrets or other confidential information; and

4. Require Daoust to immediately identify in writing for Concentrix the identities of all persons and entities with whom he has shared any Concentrix trade secrets or other confidential or proprietary information.

(Doc. 21-1). Concentrix defines its trade secret, confidential and/or proprietary information as, "including without limitation confidential information pertaining to Concentrix's technologies, employees, customers, prospective customers, costs, profit margins, salaries, pricing, strategies, business plans, techniques, methods, processes, sales, finances, sales plans, and any and all trade secrets, as well as all other confidential information relating to Concentrix's means of delivering services to its clients and their customers." (*Id.*)

**A.**     **Evidence as Presented by the Parties**

**1.**     **Concentrix's Evidence**

**i.**     **The Non-Compete Agreement ("NCA")**

Daoust signed an NCA with Concentrix on August 20, 2018.  (Doc. 14-1).  Daoust

signed the NCA electronically.  (*Id* at 6).  In consideration for signing the NCA, Daoust

was offered an award of stock in Convergys (later acquired by Concentrix).  (Doc. 24-1).

The NCA provides that Daoust:

> will be entrusted with, have access to, and obtain intimate,
> detailed, and comprehensive knowledge of confidential and/or
> proprietary information that is not generally known by the
> public ("Information"), including confidential information
> concerning: (i) the Company's and/or its customers' and/or
> suppliers' processes, practices, and procedures; (ii) the
> Company's customers, suppliers and employees; (iii) the
> Company's advertising and marketing plans; (iv) the
> Company's strategies, plans, goals, projections, and
> objectives; (v) the Company's research and development
> activities and initiatives; (vi) the strengths and weaknesses of
> the Company's products or services; (vii) the costs, profit
> margins, and pricing associated with the Company's products
> or services; (viii) the Company's sales strategies, including the
> manner in which it responds to customer requests and requests
> for information or requests for proposals; (ix) the Company's
> business, including budgets and margin information, and (x)
> matters or intellectual property considered confidential by the
> Company, its customers, or suppliers, including information
> considered confidential by such customers' or suppliers'
> customers, vendors, or other third-party providers, and any
> information of a third party that the Company designates as
> confidential (e.g., third-party information accessed or used by
> Employee during his/her employment).

(Doc. 14-1 at § 2) (underline in original).  This Section further provides that Daoust

"agrees that the Information is highly valuable and provides a competitive advantage to

the Company." (*Id*.)  Similarly, it requires Daoust to return all Information, and any

copies of the Information, at the end of his employment with Concentrix.  (*Id*.)

The NCA also provides the following:

> Employee recognizes the Company's need to prevent unfair competition and to protect the Company's legitimate business interests.  Accordingly, Employee agrees that, during Employee's employment and **for a period of one year** following Employee's termination or separation (for any reason), Employee will not accept employment or engage in any business activity (whether as a principal, partner, joint venturer, agent, employee, salesperson, consultant, independent contractor, director, or officer) with a "Competitor" of the Company where such employment would involve Employee:
>
> (i)  developing, marketing, providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products similar to those services or products with which Employee had any involvement or Information during Employee's employment with the Company (including any products or services being researched or developed by the Company during Employee's employment with the Company); or
>
> (ii)  providing or performing services that are similar to any services that Employee provided to or performed for the Company during Employee's employment with the Company.

(*Id*. at § 3 (emphasis in original)).  A "Competitor" is defined as:

> any business or entity that, at any time during the one year period prior to and/or the one-year period following Employee's termination or separation, provides or seeks to provide, any products or services similar to or related to any products sold or any services provided by the Company…

(*Id*.)  The NCA then provides examples of "Competitors," which includes "without

limitation," any company or business that:

5

(i)     provides outsourced customer management and/or customer care services (including but not limited to customer service; customer retention; technical support; business-to-consumer sales; complex device support; business-to-business sales and account management; back office; collections; quality assurance; direct response; and home agent);

(ii)    operates call centers and/or employs home agents to provide customer management and/or customer care services;

(iii)   provides products or services similar or related to, or in competition with, the products or services provided by any entity or business that is acquired by or merged into the Company during Employee's employment with the Company; or

(iv)    is identified by the Company as a competitor in any of the Company's public filings with the Securities and Exchange Commission.

(*Id.*)

As stated, Daoust signed an NCA in consideration for stock-options, leading to two agreements – the Performance Restricted Stock Unit ("PRSU") and the Time-Based Restricted Stock Unit ("TRSU") Agreements (collectively, the "Stock-Option Agreements"). (Docs. 24-2, 24-3). Each Stock-Option Agreement includes an NCA.

The PRSU (Doc. 24-2) includes two consecutive NCA's – a first version which was attached to the Amended Complaint (*compare* Doc. 14-1 *with* Doc. 24-2 at 10–14), and a second version which was attached to the December 23 letter (*compare* Doc. 22-1 at Ex. A.1 *with* Doc. 24-2 at 15–19). Daoust's one electronic signature on the PRSU is <u>after both</u> NCAs, and is time-stamped "08/20/2018 09:42 AM U.S. Eastern Standard Time." (Doc. 24-2 at 20). According to Concentrix, the second version attached to the

PRSU was "apparently included by mistake by Fidelity Investments when it delivered the PRSU to Mr. Daoust electronically." (Doc. 24-1, the "Gabbard Decl.," at ¶ 3).[4]

The TRSU includes only one NCA, and is the same as the second version in the PRSU and the December 23 letter. (*Compare* Doc. 22-1 at Ex. A.1 *with* Doc. 24-2 at 15– 19 *with* Doc. 24-3 at 8–13). Daoust's electronic signature on the TRSU is at the end of the document, and is time-stamped "08/20/2018 09:42 AM U.S. Eastern Standard Time." (Doc. 24-3 at 12–13).

### ii.       Daoust's Role at Concentrix

Daoust started working for Convergys Corporation, now Concentrix, in 1999. (Gabbard Decl. at ¶ 3; Doc. 14 at ¶ 23). During his 22-year career with Convergys/Concentrix, he had risen to the level of Senior Vice-President – Operations. (Doc. 25-1, the "Twomey Decl.," at ¶ 10; Doc. 14 at ¶ 23).[5] When Daoust resigned from Concentrix, his base salary was $300,000, plus "Concentrix Incentive Plan" and "Long-Term Incentive" pays. (Gabbard Decl. at ¶ 4). During his last five years of employment, Daoust averaged $89,097 and $75,040 of each incentive pay, respectively. (*Id.*)

---

[4] Jennifer Gabbard is the Director of Compensation of Concentrix CVG Corporation. Gabbard submitted a declaration and attachments in support of Concentrix's motion for preliminary injunction (Doc. 24-1, 24-2, and 24-3).

[5] Cormac Twomey is the Executive Vice-President – Global Operations and Service Delivery for Concentrix UK Ltd. Twomey submitted a declaration in support of Concentrix's motion for preliminary injunction (Doc. 25-1). The Twomey Declaration was originally attached to Concentrix's Reply (Doc. 24-2). However, the manner and formatting in which the declaration was filed cut off lines of text at the bottom of each page. (*Compare* Doc. 24-2 *with* Doc. 25-1). Concentrix then re-filed a reformatted version (Doc. 25-1), which the Court considers for the purposes of this Order.

Daoust's role at Concentrix included managing relationships with employees and overseeing Concentrix's call-centers. (Twomey Decl. at ¶ 10; Doc. 14 at ¶ 25). Daoust served clients in the digital economy and supervised Concentrix's services to its clients. (Twomey Decl. at ¶ 15). At the time of his resignation, he was working (remotely and in-person) on an assignment in the Philippines. (Twomey Decl. at ¶ 11; Doc. 14 at ¶ 25).

### iii.     The Business of Concentrix and TaskUs

Concentrix provides outsourced customer-service management, call-center operations, and general business-process management ("BPM"), or business-process outsourcing ("BPO") services to its customers. (Twomey Decl. at ¶ 2). Concentrix serves between 450 and 600 customers, including technology, innovation, and digital economy companies. (*Id*.) Concentrix operates world-wide. (*Id*. at 4). Concentrix's services includes traditional voice-support services, as well as non-traditional voice support services, such as digital customer-experience support and artificial intelligence operations. (*Id*. ¶ 15).

One-quarter of Concentrix's $500 billion annual revenue is derived from its operations in the Philippines, including call-centers. (*Id*. at ¶ 6). According to Twomey, TaskUs is a "younger and smaller" company, but a growing competitor and the two companies often compete for the same clients and same work. (*Id*. at ¶¶ 12–13). TaskUs now lists the Philippines as one of its prime locations, and TaskUs has opened at least two new call-centers in the Philippines within the past few months. (*Id*. at ¶ 14).

"Within the last few weeks" of Twomey's April 16, 2021 Declaration, Concentrix was awarded, over TaskUs, a contract to perform content-moderation and content-

security services for a major digital economy company. (*Id*. at ¶ 24). And, four days after TaskUs lost that contract, TaskUs offered a job to another Concentrix employee, a Director of Recruitment. (*Id*.)

### 2. Daoust's Evidence

### i. Careers at Concentrix and TaskUs

As Senior Vice-President – Operations for Concentrix, Daoust would be assigned to a specific account or region to oversee an assignment, often across the globe. (Doc. 22-1, the "Daoust Decl.," at ¶ 3). During his last year with Concentrix, Daoust was assigned to the Philippines, and his primary job responsibilities included managing Concentrix's call centers in that specific area. (*Id*. at ¶ 5). Daoust returned all Concentrix equipment and materials, including his work laptop, access card, and cut-up corporate credit card prior to his last day of employment. (*Id*. at ¶ 10).

Daoust began working at TaskUs on January 18, 2021 as Chief Operating Officer. (*Id*. at ¶ 1). Daoust viewed the career change as a potential for advancement, given he was confined to specific regions at Concentrix and the TaskUs role is much broader. (*Id*. at ¶ 8). In Daoust's role as Chief Operating Officer of TaskUs, Daoust oversees TaskUs' company-wide, world-wide operations, including customer experience support, content security, and artificial intelligence operations services. (Rosner Decl. at ¶ 14; Daoust Decl. at ¶ 17).[6] In this role, "Daoust is expected to rely on his extensive experience and

---

[6] Brandy Rosner is the Vice President of People Operations of TaskUs. Rosner submitted a declaration and attachments in support of Concentrix's motion for preliminary injunction (Doc. 22-2).

knowledge of the general customer service industry to employ effective operational techniques and methods." (Rosner Decl. at ¶ 14).

When Daoust began working for TaskUs, he was explicitly instructed not to copy, replicate, share, transmit, or otherwise reveal any confidential or trade secret Concentrix information. (*Id*. at ¶ 10). Daoust declares he has not done as such. (Daoust Decl. at ¶ 12). Moreover, TaskUs has explicitly instructed Daoust not to solicit any Concentrix customers or employees. (Rosner Decl. at ¶¶ 11–13). Daoust declares (swears) that he has not done so. (Daoust Decl. at ¶¶ 13–14).

### 3. Business of TaskUs and Concentrix

TaskUs is a service-oriented company, providing BPO services to customers. (Rosner Decl. at ¶ 2). TaskUs serves high-growth technology companies, including start-ups, to represent, protect, and grow their brands. (*Id*. at ¶ 4). TaskUs achieves this by offering digital outsourcing services, such as digital customer experience, content security, and artificial intelligence operations. (*Id*. at ¶ 3).

Concentrix and TaskUs are admittedly in the same BPO industry, but, according to Rosner, each company's primary services and customers are not the same. (*Id.* at ¶ 15). TaskUs' primary focus is non-traditional voice support services, and this is different than Concentrix's traditional voice support services. (Daoust Decl. at ¶ 17).

TaskUs has hired, from Concentrix, at least 15 individuals, director level and above, and eight of whom are sales and customer-facing. (Rosner Decl. at ¶ 9). Daoust is the first employee about whom Concentrix has raised a concern regarding confidential or trade secret information. (*Id.*)

## II. MOTION TO STRIKE

Daoust moved to strike all of the evidence attached to Concentrix's reply in support, which includes (1) the Gabbard Declaration, and Stock-Option Agreements attached (Docs. 24-1, 24-2, and 24-3); and (2) the Twomey Declaration (Doc. 25-1). (Doc. 26). The Court already denied this motion. (4/22/2021 Notation Order). However, the Court provides a more detailed analysis of its decision here.

### A.      Gabbard Declaration and Attachments

Daoust contends that the Gabbard Declaration and attachments are improperly submitted for the first time on reply in violation of Local Rule 7.2(d). (Doc. 26 at 2–4). Daoust also contends that the Gabbard Declaration and attachments should be stricken as misleading based on Federal Rule of Evidence 403, because the documents create more confusion than clarity as to the which NCA applies. (Doc. 26 at 6).

Local Rule 7.2(d) provides that "all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence. Evidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition." S.D. Ohio Civ. R. 7.2(d) (emphasis added).

The Court finds that the Gabbard Declaration and attachments were submitted to rebut the positions taken by Daoust in his memorandum in opposition and that the documents are not misleading.

In his opposition, Daoust raises several issues regarding the authenticity of the NCA. (Doc. 22 at 10–13). Daoust argues that the NCA attached to the Amended

Complaint (Doc. 14-1) was not the same NCA that was attached to the December 23 letter from Concentrix which put TaskUs on notice of Daoust's alleged violation of the NCA. (Doc. 22-1 at Ex. A.1). When comparing the two documents, Daoust points to differences in the two NCAs, including the inconsistent pagination, the page number of Daoust's signature, the different definition of "Competitor," the different footers, and the different intellectual property provisions. Because of these "oddities," Daoust objected to the use of *any* NCA to award injunctive relief. (Doc. 26) Thus, because there is no NCA, Daoust contends Concentrix cannot succeed on the merits. (Doc. 22 at 10–13).

The Gabbard Declaration helps resolve these "oddities." Concentrix filed and attached an NCA signed by Daoust, albeit an incomplete document, to the Amended Complaint and December 23 letter. Most of Daoust's issues raised in his opposition over the NCA – page numbers, footers, etc. – are resolved by the Gabbard Decoration and attachments. The Gabbard Declaration and attachments are more helpful than misleading or confusing. And, although including the full version of the Stock-Option Agreements at the onset, instead of cherry-picking the NCA portions of the Agreements, would have avoided this briefing, failing to consider and striking these documents would not serve justice.

Accordingly, the motion to strike (Doc. 26) the Gabbard Declaration and attachments (Docs. 24-1, 24-2, and 24-3) is **DENIED**.

### B.    Twomey Declaration

Daoust also contends that the Twomey Declaration is improperly submitted for the first time on reply in violation of Local Rule 7.2(d). (Doc. 26 at 2–4). However, as with

the Gabbard Declaration, the Twomey Declaration rebuts the positions taken by Daoust in his opposition. In Concentrix's Amended Complaint, Concentrix alleged that Concentrix and TaskUs are competitors, describing each company's business. (Doc. 14 at ¶ 39). This is verified twice in the pleadings by Jason Murphy, Global Vice-President – Legal for Concentrix CVG Corporation. (Doc. 14-2; Doc. 15-1). In his response in opposition to the motion for preliminary injunction, Daoust contests whether Concentrix and TaskUs are competitors, and presents testimony that the two are not competitors. (Doc. 22 at 19–20; Daoust Decl. at ¶¶ 2, 17–18; Rosner Decl. at ¶¶ 3–4, 14–15). The Twomey Declaration rebuts these arguments; moreover, the Court declines to the strike the declaration as untimely.

Daoust then contends that certain paragraphs in the Twomey Declaration should be stricken for lack of foundation and/or inadmissible hearsay. (Doc. 26-5). Fed. R. Evid. 602, 802. Specifically, he requests that Paragraphs 12–14, 16–20, and 24 should be stricken. In sum, these paragraphs describe Twomey's knowledge of the BPO industry and how Concentrix and TaskUs are competitors (¶¶ 12–14); Twomey's knowledge of the alleged confidential information in Daoust's possession (¶¶ 16–20); and a recent example of Concentrix and TaskUs competing for the same client (¶ 24).

Preliminary injunctions are governed by less strict rules of evidence:[7]

---

[7] It may very-well be appropriate to consider a <u>preliminary</u> injunction proceeding as one of the "miscellaneous proceedings" to which the Federal Rules of Evidence do not apply. Fed. R. Evid. 1101(d) (exceptions to the Rules). Although the specific "exceptions" listed in that Rule relate to criminal proceedings (*e.g.*, grand-jury proceedings, issuing an arrest warrant, preliminary examination in a criminal case), many concern the <u>preliminary</u> stages of those proceedings.

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *compare* Fed. R. Civ. P. 56 (requiring affidavits supporting summary judgment to be "made on personal knowledge, [and to] set out facts that would be admissible in evidence"), *with* Fed. R. Civ. P. 65 (providing no such requirement in the preliminary injunction context).

Moreover, with regards to hearsay, the Sixth Circuit has not explicitly stated whether hearsay evidence should not be considered in the context of a preliminary injunction. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 n.4 (6th Cir.1985) ("The parties assume that the Federal Rules of Evidence are fully applicable to a hearing on a motion for preliminary injunction. We express no opinion on this question."). "This Court, however, and other district courts within this circuit have considered such evidence, as have numerous other circuit courts," and accorded weight to evidence even properly characterized as hearsay at the preliminary injunction stage. *Damon's Restaurants, Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 620 (S.D. Ohio 2006) (collecting cases).

Thus, considering the case law, at a minimum, it is appropriate for the Court to accord weight to the Twomey Declaration, even assuming it would not be admissible evidence at trial. However, the Twomey Declaration survives evidentiary scrutiny.

First, the Twomey Declaration lays sufficient foundation. Twomey has been the Executive Vice-President – Global Operations and Service Delivery for Concentrix for more than two years, and with Concentrix for the past seven. (Twomey Decl. at ¶ 1). He has worked in the BPO industry for more than two decades and is familiar with industry key players, market trends, and customer preferences. (*Id*. at ¶ 2). He consistently testifies to his knowledge of the industry. (*See, e.g., id.* at ¶ 12 ("from my years of experience in the BMP/BPO industry"); ¶ 13 ("the best of my knowledge from my years in the BMP/BPO industry")). If Twomey's experience in the industry does not lay the foundation for industry knowledge, it is difficult to imagine what person in the BMP/BPO industry could testify about his or her knowledge of that industry.

Moreover, Twomey lays the foundation for his statements regarding Daoust. Twomey and Daoust worked together since 2014. (*Id*. at ¶ 9). Daoust was Twomey's direct report on two different occasions, including Daoust's most recent role with Concentrix overseeing the Philippine call-centers. (*Id*.) Twomey and Daoust spoke formally at least three to five times a week, and informally at other times. (*Id*.) With this background, Twomey laid the foundation related to his work with Daoust, and in his perspective, what information Daoust would know about Concentrix's business and operations. Thus, even under strict evidentiary standards, and notwithstanding the less-stringent evidentiary standards considered during a motion for preliminary injunction, Twomey's declaration lays the necessary foundation.

As to hearsay, the paragraphs Daoust seeks to strike are not properly characterized as hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter

asserted.  Fed. R. Evid. 801.  The statements made by Twomey are not out of court

statements.  Moreover, the statements are made in a declaration, before this Court, based

on Twomey's personal knowledge of the BPO industry, his work at Concentrix, and his

work with Daoust.  Daoust's objections to the Twomey Declaration are not well-taken.

Accordingly, the motion to strike (Doc. 26) the Twomey Declaration (Doc. 25-1)

was and is **DENIED**.

### III.  MOTION FOR PRELIMINARY INJUNCTION

Plaintiff bears <u>the heavy burden</u> of demonstrating its entitlement to injunctive

relief.  An "injunction is an **extraordinary remedy** which should be granted only if the

movant carries his or her burden of proving that the circumstances <u>clearly</u> demand it."

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)

(emphasis added).

In determining whether to grant injunctive relief, this Court must weigh four

factors: (1) whether the moving party has shown a strong likelihood of success on the

merits; (2) whether the moving party will suffer irreparable harm if the injunction is not

issued; (3) whether the issuance of the injunction would cause substantial harm to others;

and (4) whether the public interest would be served by issuing the injunction.  *Hall v.*

*Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017).  These four

considerations are factors that must be balanced, not prerequisites that must be met.

*McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

"Although no one factor is controlling, a finding that there is simply no likelihood of

success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

## III.  ANALYSIS

### A.  Likelihood of Success

The first preliminary injunction factor is whether Plaintiff has established a strong likelihood of success on the merits.  To establish a strong likelihood of success on the merits, a plaintiff  "is not required to prove [its] case in full." *Univ. of Tex.*, 451 U.S. at 395.  However, a plaintiff "must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  In this case, Concentrix alleges two claims against Daoust for breach of contract related to the NCA and misappropriation of trade secrets.  The Court considers each in turn.

### 1.  Breach of Contract (NCA)

Under Ohio law, to succeed on a breach of contract claim, a plaintiff must show (1) that a contract existed, (2) that the plaintiff fulfilled his contractual obligations, (3) that the defendant failed to fulfill his contractual obligations, and (4) that the plaintiff incurred damages as a result of the defendant's failure. *Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009).

In response to Concentrix's motion, Daoust challenges the first and third elements. (Doc. 22).  Particularly, Daoust challenges: (1) the authenticity of any NCA; (2) if there is a valid NCA, the enforceability of the NCA; and (3) if there is an enforceable NCA, any actual breach by Daoust.  (*Id.*)  Daoust contends that these issues over authenticity,

enforceability, and actual breach show that Concentrix is unable to carry is heavy burden of demonstrating that it is entitled to injunctive relief.

### i.    Authenticity of the NCA

As discussed *supra*, Daoust raised several issues regarding the authenticity of the NCA. The Court resolved many of these technical issues, such as the page numbers and footers, when discussing the motion to strike. What remains to be discussed are the multiple versions of the NCA.

To reiterate, the Stock-Option Agreements both included NCAs. The PRSU included two versions consecutively, and the TRSU included one version. (Docs. 24-2, 24-3). The second version in the PRSU and TRSU are the same. Both Stock-Option Agreements were electronically signed at the exact same time by Daoust. (Docs. 24-2 at 20, 24-3 at 12–13).

Daoust contends that the multiple versions of the NCA create an insurmountable hurdle when proving what, if any, NCA could bind Daoust at this preliminary injunction stage. (Doc. 22 at 13). The Court disagrees.

On the Court's review, the two versions of the NCAs are almost the same. The Court notes two differences – both also argued by Daoust. First, the intellectual property provision in the second version is more detailed than the first version. (*Compare* Doc. 24-2 at 12, § 6 *with* Doc. 24-2 at 17, § 22). This provision is not important to Concentrix's claims in this case.

Second, the prohibited employment is different in the two versions. This section prohibits an employee from accepting employment with a Competitor that would involve:

     (i)     developing, marketing, providing, selling or attempting to sell, or assisting in the sale or attempted sale of, any services or products similar to those services or products with which Employee had any involvement or Information during Employee's employment with the Company (including any products or services being researched or developed by the Company during Employee's employment with the Company); or

     (ii)     providing or performing services that are similar to any services that Employee provided to or performed for the Company during Employee's employment with the Company; *or*

     *(iii)     serving as an officer of any Competitor.*

(*Compare* Doc. 24-2 at 11, § 3 *with* Doc. 24-2 at 16, § 20) (changes from first to second version in italics).[8] Because this prohibited employment section is relevant to Concentrix's claims, the Court will consider only the first version of the NCA.  In other words, the Court will consider (i) and (ii), but not (iii), because this subsection does not appear in the first version.  However, this minor difference between the two versions does not render the NCA invalid given that Daoust signed both versions of the NCAs at the exact same time.

     Moreover, the Court repeats that **the two nearly identical versions of the NCAs were signed by Daoust, at the exact same time**, **and in consideration for stock-**

---

[8] Concentrix also states that the second version, with the more-defined prohibited acts, was mistakenly included in the PRSU.  (Gabbard Decl. at ¶ 8).  This statement also supports this Court's conclusion to consider the first version for the purposes of this Order.  However, *if* the second version applied, Concentrix may have had a stronger showing of likelihood of success on the merits on its breach of contract claim because Daoust's position as Chief Operating Officer at TaskUs creates a strong showing that Daoust is serving as an officer of a competitor.

**options** in the company.  And, despite Daoust's technical arguments and bluster over the NCAs, the Court has found no instance where Daoust <u>denies</u> having signed an NCA. Although future discovery may further explain the added pages to the PRSU and which versions applies, at this preliminary stage, the Court finds that Daoust signed an NCA.  It is appropriate for the Court to consider the terms of the first NCA when determining whether Concentrix is entitled to injunctive relief.

Accordingly, the Court finds that there is a valid NCA.

### ii.        Reasonableness

The next concern Daoust raises is whether the NCA is unenforceable because it is unreasonable.  In Ohio, reasonable non-compete agreements are enforced, and unreasonable non-compete agreements are enforced to the extent necessary to protect an employer's legitimate interest.  *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 275 (Ohio Ct. App. 2000). The Supreme Court of Ohio has held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."  *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).

When determining the validity on a non-compete, "each case must be decided on its own facts."  *Id*.  Courts consider the following nine factors in assessing the reasonableness of a non-compete agreement: (1) whether the covenant imposes temporal and spatial limitations; (2) whether the employee had contact with customers; (3) whether the employee possesses confidential information or trade secrets; (4) whether the

covenant bars only unfair competition; (5) whether the covenant stifles the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportionate to the employee's detriment; (7) whether the covenant destroys the employee's sole means of support; (8) whether the employee's talent was developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 544). If a non-compete agreement is unreasonable, courts are empowered to modify the terms to create a reasonable covenant between the parties. *Rogers v. Runfola & Assoc. Inc.*, 565 N.E.2d 540, 544 (Ohio 1991).

Considering these factors and the evidence presented by the parties, the Court finds that Concentrix has not carried its burden of showing that the NCA is reasonable and enforceable in scope.

**Time and Space Limitations.** The NCA has reasonable time and space limitations, given that one-year non-competes are routinely upheld and the nearly global scope of Concentrix's operations. (Twomey Decl. at ¶ ). *See Ak Steel Corp., v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *15 (S.D. Ohio Apr. 17, 2014) ("[a]s for the one-year time limitation, it is facially reasonable under Ohio law") (collecting Ohio cases); *Convergys Corp. v. Wellman*, No. 1:07-CV-509, 2007 WL 4248202, at *7 (S.D. Ohio Nov. 30, 2007) (global space limitation reasonable in scope). This factor weighs in favor of Concentrix.

**Contact with Customers.** The evidence presented suggests that Daoust had contact with customers; however, Daoust was not in a sales position or customer-facing, nor was he the sole contact for Concentrix with any one customer. (Twomey Decl. at ¶¶ 10, 17; Daoust Decl. at ¶ 5). This factor weighs in favor of Daoust.

**Confidential Information and Trade Secrets.** Concentrix contends that Daoust has knowledge of Concentrix's clients, its relationships with clients, material terms of client contracts, historical knowledge of Concentrix's performance under contracts, and the manner it operates is business (particularly its call-centers and content-moderation services). (Doc. 24 at 2). In essence, Concentrix contends that Daoust's employment as Senior Vice President, and 22-year career with Convergys/Concentrix, allowed him access to confidential business information, and the NCA is necessary to protect that information. (Twomey Decl. at ¶¶ 16–21).

As discussed *infra*, the Court is not convinced that, at this preliminary stage in the litigation, Concentrix will likely succeed on the merits of its trade secret claim. However, this factor still bears discussion because "[c]onfidential information need not meet the stringent requirements of a trade secret to constitute a legitimate business interest protectable by a non-compete agreement." *Ak Steel Corp.*, No. 1:14CV174, 2014 WL 11881029 at *11 (citing Ohio cases).

Concentrix has a legitimate business interest in protecting it confidential information by enforcing a non-compete. *Ak Steel Corp.*, 2014 WL 11881029 at *12. Concentrix contends that its confidential information includes client information, such as the identity of its clients, the material terms of the contract, relationships with clients, and

knowledge of the method Concentrix operates.  Similarly, the NCA lists an extensive list of purported confidential and/or trade secret information.  (Doc. 14-1 at § 2).

However, the record before the Court establishes that, although Daoust may have *some* of this knowledge, his primary role at Concentrix was <u>not</u> customer facing. (Twomey Decl. at ¶ 10; Rosner Decl. at ¶ 5).  Instead, his role was focused on managing and overseeing Concentrix's call centers.  Moreover, the record indicates that TaskUs has hired director-level sales and customer-facing Concentrix employees previously, and those individual hires were not challenged by Concentrix.  (Rosner Decl. at ¶ 9). Concentrix has not carried its burden of showing that the customer information is protected, confidential information.

Thus, the Court is left to consider whether Daoust's knowledge of Concentrix's organization and operational management – his primary role when overseeing call-centers – constitutes confidential information.  And, based on the evidence presented by Concentrix, the Court is not now convinced that such information is confidential information.  The record does not establish how the manner Concentrix organizes its teams is unique or how it may be different from any other business that operates call-centers.  At most, Concentrix vaguely states that:

> Mr. Daoust knows the ways that Concentrix organizes the teams that manage its call-center operations and its content-moderation operations for particular clients in particular parts of the world, including the Philippines.  The ways that these teams are structured helps Concentrix process large volumes of customers and content in a very efficient manner.

(Twomey Decl. at ¶ 19). This statement does not establish how call-center operations and management are confidential.

Moreover, the Court finds persuasive the fact that Daoust has now worked for TaskUs for over four months, and the record before the Court is silent on any instances of Daoust stealing Concentrix's clients, employees, or otherwise using confidential information. Although Concentrix is not required to prove its case in full at this stage, it is still Concentrix's heavy burden of showing that the likelihood of succeeding on the merits is more than a mere possibility.

Accordingly, this factor tips in Daoust's favor.

**Limiting Unfair or Ordinary Competition**. This factor considers whether the NCA prohibits not only unfair competition, but stifles ordinary competition. To summarize the sections of the NCA at issue, as provided in full *supra*, the NCA prohibits Daoust from "providing or performing services that are similar to any service" that he provided to Concentrix to a Competitor. (Doc. 14-1 at § 3). The NCA prohibits Daoust from "developing, marketing, providing, [or] selling" any services similar to those services he provided to Concentrix for a Competitor. (*Id.*) Under the agreement, a "Competitor" is defined as another business entity that is providing the same or similar services as Concentrix, including BPO services, customer care services, and call-centers. (*Id.*) The NCA is limited to one year and "the geographic area where the Company is doing business and…markets its products and/or services." (*Id.*)

Daoust's career at Concentrix spanned 22 years, and multiple regions and assignments. His skill set, as Concentrix contends, was overall operational management

and efficiency of Concentrix's call-centers and services. Concentrix, by its own statements, is global in scope. Considering these broad provisions, the NCA would prevent Daoust from obtaining <u>any</u> job with <u>any</u> company, world-wide, that touches BPO services like Concentrix, regardless of whether that company is an actual competitor of Concentrix or Daoust is performing a role that is substantially similar to his current role. This stifles not only unfair competition but ordinary competition.

When reaching this conclusion, the Court recognizes that the parties dispute whether TaskUs and Concentrix are actually "Competitors" under the NCA and whether Daoust's role with TaskUs is actually "unfair." TaskUs and Concentrix are admittedly in the same BPO industry. (Rosner Decl. at ¶ 15). However, Rosner and Daoust both contend that TaskUs and Concentrix are not competitors because the type of clients each services, and services each provides, are different. (Rosner Decl. at ¶¶ 4, 14–15; Daoust Decl. at ¶ 17). According to Rosner and Daoust, TaskUs provides non-traditional voice support services, whereas Concentrix focuses on traditional voice support services. (Rosner Decl. at ¶¶ 4, 14–15; Daoust Decl. at ¶ 17). According to Rosner and Daoust, TaskUs services technology companies, particularly start-ups, whereas Concentrix services large, Fortune 500 companies. (Rosner Decl. at ¶¶ 4, 14–15; Daoust Decl. at ¶ 17). Twomey, for Concentrix, refutes these contentions, arguing that Concentrix also provides non-traditional voice support services and the two companies regularly compete for the same clients. (Twomey Decl. at ¶¶ 12–14, 26–24).

Considering the foregoing, at this preliminary stage, the Court finds that Concentrix and TaskUs are competitors. Although TaskUs may specialize in non-

traditional voice support services, Concentrix also provides non-traditional voice support services. (*Id*. at ¶ 15). TaskUs and Concentrix have competed for the same business. (*Id*. at ¶ 24). Moreover, TaskUs is targeting the Philippines for its operations, opening two or three new call-center sites in the Philippines within the last few months. (*Id*. at ¶ 14).

However, this finding that TaskUs and Concentrix are competitors does not change this Court's determination that the NCA stifles ordinary competition. As written, and as Concentrix asks this Court to enforce the NCA, the NCA would prevent Daoust from taking any role with TaskUs – he could be precluded from taking a call-center, operator job at TaskUs since that role would be related to Daoust's call-center services. Moreover, Daoust's role at TaskUs is much broader than his role at Concentrix. At TaskUs, Daoust is overseeing company-wide and global operations; whereas at Concentrix, he managed call-centers in a specific region, specifically the Philippines, during his last year of work. Concentrix is asking to this Court to enjoin Daoust from his <u>entire</u> role at TaskUs, impacting its <u>global</u> operations across <u>all</u> services, not merely in a targeted region or for limited roles, such as management of call-centers in the Philippines. Thus, from the record before the Court, Concentrix is seeking to impact ordinary competition from a competitor, not just unfair competition.

Accordingly, this factor weighs in favor of Daoust.

**Stifle Employee's Inherent Skills/Employees Skills Developed During Employment/Benefit to Employer and Detriment to Employee/Employee's Sole Means of Support.** These factors are related and will be addressed together. It is undisputed that Daoust developed his talent and expertise through his 22-years of

employment with Convergys/Concentrix. Daoust was not a minor Concentrix employee, serving as a Senior Vice-President – Operations, and receiving a salary and bonuses of nearly a half-million dollars during his last five years of employment with Concentrix. Moreover, Daoust could likely find a position working in general business management, using his overall knowledge of operational efficiency and management, at a non-competitor of Concentrix. Concentrix would also benefit from enforcing the NCA. Daoust is working for a competitor of Concentrix – in particular, the record at this stage indicates that TaskUs is focusing its efforts on expanding its call-centers in the Philippines, the specific location at which Daoust was last assigned with Concentrix.

On the other hand, enforcing the NCA would be to the detriment of Daoust. Daoust raises concerns of being able to provide for his family. (Daoust Decl. at ¶ 19). And, Daoust states that his new position represents a substantial advancement in his career. (*Id*. at ¶ 8). "Consequently, [Daoust] would be disproportionately disadvantaged by enforcing the agreement because he would be required to forego a significant and perhaps unique promotional opportunity." *Convergys*, 2007 WL 4248202 at *9.

Yet, even considering the detriment to Daoust, Daoust received a benefit for signing the NCA in the form of stock-options. *If* the NCA was enforceable as written, any detriment to Daoust would be caused by his own breach. See *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 ("Any harm to [defendant] would be as a direct result of his own actions" in breaching restrictive covenants in an employment agreement).

When considering the foregoing, these factors weigh slightly in favor of Concentrix.

**Forbidden Employment Incidental to the Main Employment.** The parties present conflicting evidence on this factor. The evidence indicates that Daoust's new role with TaskUs, although possibly reaching some of the same services he provided to Concentrix, is much broader. At TaskUs, he is overseeing the entirety of company-wide and world-wide operations; conversely, at Concentrix, he was assigned to one specific region, the Philippines during his last year of his employment, and managing operations and call centers in that region. However, when looking at his employment in total, he is/was likely working in similar capacities for both companies by overseeing and managing operations.

Thus, this factor weighs in Concentrix's favor because the restricted employment is likely Daoust main employment.

**Summary of Factors.** There are many factors that weigh in favor of Concentrix and finding the agreement reasonable: time and spatial limitations; the ability for Daoust to seek an incidental employment at a non-competitor using his general business knowledge; and allowing Concentrix to enforce a bargained-for NCA. But, the remaining factors, at this preliminary stage, demonstrate that enjoining Daoust's employment with TaskUs and enforcing the agreement would be unreasonable. Although Daoust had some customer contact, he was not soliciting customers for Concentrix nor the sole contact for any customer. Daoust would face detriment if the agreement were enforced, forcing him to forego a career advancement opportunity. The NCA, as

Concentrix seeks to enforce it, eliminates ordinary, not only unfair competition. And, Concentrix is likely not prejudiced to the extent Daoust has knowledge of any of Concentrix's purported confidential information.

Thus, considering the foregoing, Concentrix has not met its heavy burden of showing that the NCA is reasonable and enforceable, and, at this preliminary stage, the Court cannot conclude that Concentrix has a likelihood of success on the merits on its breach of contract claim.

### 2. Misappropriation of Trade Secrets

Concentrix's second claim against Daoust is for misappropriation of trade secrets. An "[a]ctual or threatened misappropriation" may be enjoined. Ohio Rev. Code § 1333. 62(A). Under Ohio law, a "trade secret" is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code. § 1333.61(D); *see also Handel's Enterprises, Inc. v. Schulenburg*, 765 Fed. App'x. 117, 122 (6th 2019). The Supreme Court of Ohio has also adopted six factors when analyzing a trade secret claim.

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000) (citations and quotations omitted). "An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id*.

To succeed on a claim under this statute, a plaintiff must demonstrate the following by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *MEMC Elec. Materials, Inc. v. Balakrishnan*, No. 2:12-cv-344, 2012 WL 3962905, at *6 (S.D. Ohio Sept. 11, 2012) (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)). Under the inevitable disclosure doctrine, a <u>threatened</u> misappropriation of trade secrets can be shown by "facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Polymet Corp.*

*v. Newman*, Case No. 1:16-cv-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016) (citing *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

In this case, Concentrix has not carried its heavy burden of showing a likelihood of success on the merits of its trade secret claim. Concentrix, in its first time on reply, lists five categories of trade secret information that it is seeking to protect: (1) material terms of its contracts with clients; (2) the way Concentrix operates and manages its call-center; (3) knowledge of particular employees' relationships with clients; (4) historical (and current) performance under the contracts; and (5) the identities of Concentrix's clients. (Doc. 24 at 16–17). Concentrix contends that "[t]hese are items of information, processes, and procedures developed over many years by Convergys and Concentrix that derive independent economic value from not being known to competitors and which are the subjects of reasonable efforts to keep them secret." (*Id*. at 17).

First, Concentrix fails to demonstrate at this stage in the proceedings the existence of trade secret information. Concentrix argues that it has taken steps to protects its purported trade secrets, such as having its employees sign NCAs, and restricting access to and within its facilities. (Doc. 7 at 12). Concentrix argues that the identity of clients is so secret that clients are often referred to as code names only. (Twomey Decl. at ¶ 17).

However, as TaskUs readily admits and Concentrix acknowledges, TaskUs has hired at least 15 former Concentrix employees in the last four years, all at director level and above, and at least eight of which were in sales roles and client-facing. (Rosner Decl. at ¶ 9; Doc. 24 at 2). And, Concentrix did not raise trade secret claims or seek to enforce NCAs with those employees. (Rosner Decl. at ¶ 9). Thus, the Court cannot say

at this juncture that Concentrix has taken the necessary steps to protect its purported, client-related trade secret information, such as the identity of clients, employee relationships with clients, and terms of contracts with clients.

Concentrix also contends that the manner it operates its call-centers is trade secret information. Yet, as discussed, there is no evidence to suggest that the manner Concentrix operates is call-centers is unique in the industry. At most, Concentrix provides the Twomey Declaration, which states that the manner Concentrix organizes and manages its call-center teams allows it to process large volumes of customers in a very efficient manner. (Twomey Decl. at ¶ 19). And, although operational efficiency is likely important to Concentrix when successfully running its business, the Court cannot say at this preliminary stage that Concentrix has carried its burden of showing that this is trade secret information.[9]

Accordingly, Concentrix has not demonstrated a likelihood of success on the merits on its misappropriation of trade secret claim or its breach of contract claim. The first element weighs against an injunction.

### B.     Irreparable Harm

The second preliminary injunction factor is whether the moving party will suffer irreparable harm if the injunction is not issued. To demonstrate irreparable harm, the plaintiff must show that it will suffer harm that is "actual and imminent" rather than

---

[9] It is unnecessary for the Court to consider the inevitable disclosure doctrine, finding that Concentrix has not carried its burden of demonstrating a strong likelihood of success on the existence of trade secrets.

"speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is not irreparable if it is fully compensable by monetary damages. *Basicomputer*, 973 F.2d at 511. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales*, 225 F.3d at 625.

Concentrix has not shown irreparable harm. Concentrix argues that it will suffer irreparable harm because Daoust will inevitably take its confidential and trade secret information to TaskUs, and use that information at TaskUs to Concentrix's detriment. However, as already discussed, the Court is not convinced that Concentrix is likely to succeed on the merits of its claims.

Moreover, the "harm" Concentrix alleges seems more speculative or unsubstantiated than actual and imminent. Four months have elapsed between Daoust's start of employment with TaskUs and Concentrix's reply brief in support of its motion for preliminary injunction. The Court considered all evidence attached to the reply in the face of Daoust's objections and motion to strike the evidence. In that reply and evidence in support, Concentrix suggests speculative harm – that Daoust *must* be using its purportedly confidential and trade secret information. But, Concentrix cites no actual or imminent risk of harm, such as a customer leaving or threatening to leave Concentrix for TaskUs, since Daoust started working for TaskUs.

Therefore, the second element of the injunction test weighs against issuing a preliminary injunction.

### C.     Harm to Others

The third preliminary injunction factor is whether granting the injunction would cause harm to others.  "The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief."  *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).  If injunctive relief were granted, the parties harmed would be Defendant Daoust and non-party TaskUs.  This harm would be of Daoust and TaskUs' own making, given Daoust signed the NCA and TaskUs proceeded with employing Daoust, even once it knew of the NCA.

The third element of the injunction test does not weigh against issuing a preliminary injunction.

### D.     Public Interest

The final preliminary injunction factor is whether granting the injunction would harm the public interest.  Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Total Quality Logistics, LLC v. OTC Logistics LLC*, No. 1:19-CV-151, 2019 WL 1300223, at *5 (S.D. Ohio Mar. 21, 2019) (quoting *UZ Eng'red Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1608, 1081 (Ohio Ct. App. 2001)).  However, there is also an interest in "not restricting employment opportunities for employees." *Convergys*, 2007 WL 4248202.  Based on the foregoing, this element does not weigh in favor nor against a preliminary injunction.

In balancing the four factors pertaining to injunctive relief, the Court finds

Concentrix has not carried it heavy burden of establishing that it is entitled to the

extraordinary relief it seeks.

However, when reaching this conclusion, the Court reiterates its finding that the

NCA is a valid agreement between Daoust and Concentrix, *even if* the covenant not to

compete provision appears unreasonable.  Although Daoust may continue his

employment with TaskUs, in accordance with the NCA, Daoust shall continue not to

solicit or attempt to solicit any of Concentrix's customers known to Daoust; solicit or

attempt to solicit any of Concentrix's employees; or provide any actual, Concentrix trade

secret information in his possession with TaskUs.  (Daoust Decl. at ¶¶ 12–15).

## IV.  CONCLUSION

Based upon the foregoing, Plaintiff's motion for preliminary injunction (Doc. 7) is

**DENIED.**

    **IT IS SO ORDERED.**

Date:  5/3/2021                               *s/Timothy S. Black*
                                                Timothy S. Black
                                                United States District Judge